**CENTER FOR AUTO SAFETY, INCORPORATED, Plaintiff–Appellant,**

v.

**Tyras ATHEY, Secretary of State of Maryland, Defendant–Appellee.**

No. 93–2417.

United States Court of Appeals, Fourth Circuit.

Argued May 9, 1994.

Decided Oct. 6, 1994.

**ARGUED:** David Charney Vladeck, Public Citizens Litigation Group, Washington, DC, for appellant. Andrew Howard Baida, Asst. Atty. Gen., Baltimore, MD, for appellee. **ON BRIEF:** Paul R.Q. Wolfson, Alan B. Morrison, Public Citizens Litigation Group, Washington, DC, for appellant. J. Joseph Curran, Jr., Atty. Gen. of MD, Marlene Trestman, Asst. Atty. Gen., Baltimore, MD, for appellee.

Before WILKINS and HAMILTON, Circuit Judges, and ELLIS, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge ELLIS wrote the opinion, in which Judge WILKINS and Judge HAMILTON joined.

## OPINION

ELLIS, District Judge:

In this appeal, we consider the constitutionality of Maryland's Charitable Organizations Solicitation Law, Md.Code Ann. Art. 41, § 3–202(g) ("the Statute"), which requires each non-exempt charity seeking to solicit in Maryland to pay a sliding scale fee based on that charity's nationwide level of public contributions. Because we find that the Statute passes constitutional muster, we affirm the district court's granting of summary judgment in favor of appellee, the Maryland Secretary of State ("the Secretary").

### I.

A. *The Statute*

The Statute in issue is not Maryland's first on the subject. Prior to 1985, Maryland law required charities to register annually and pay a flat fee of $25.00 per year. In 1985, the annual fee was eliminated and replaced with a one-time registration fee of $50.00 with annual renewals at no additional expense. By 1989, however, the Secretary determined that the funds generated through the $50.00 one-time fee fell far short of the actual costs incurred for monitoring and administering charitable organizations in Maryland. In January 1989, House Bill 165 was introduced in the Maryland legislature to accomplish two related goals: (1) to reinstate the annual fee in order to help defray the administrative costs of the renewal system and (2) to replace the flat fee system with a sliding scale based on total contributions received by the charity in the prior year. In proposing that the sliding scale should be based upon nationwide contribution levels,

the Secretary asserted that the sums raised under such a fee system would approximate the costs of administration and enforcement.

The legislation was enacted. Md.Code Ann. Art. 41, § 3–202.[1] In addition to the sliding scale fee, the Statute imposes a number of further requirements on charitable organizations based in Maryland or seeking to solicit funds in Maryland. Specifically, the Statute requires every charitable organization[2] located in Maryland and every out-of-state charity that intends to solicit funds in Maryland to file with the Secretary a registration statement and annual reports for each subsequent year in which the charity solicits or operates in Maryland. Md.Code Ann. § 3–202(a). Where a charity's gross income from all public contributions in the most recent fiscal year equals or exceeds $100,000 and is less than $250,000, the registration statement must be accompanied by an independent public accountant's review of the charity's financial information. Md.Code Ann. § 3–202(b)(2). Where total contributions to a charity equal or exceed $250,000, an independent certified public accountant's audit of the charity's financial information must be included. *Id.* In addition, if a charity's contributions exceed $100,000, its annual report, which must be filed with the Secretary within six months of the close of the charitable organization's fiscal year, must be accompanied by either an independent certified public accountant's review or an audit. Md.Code Ann. § 3–202(e)(1).[3]

The Statute also vests the Secretary of State with investigatory, enforcement, and emergency powers, including the authority to cancel a charity's registration, to take emergency action, including the issuance of summary cease and desist orders, and to refer cases to the Maryland Attorney General for civil and criminal prosecution. *See* Md.Code Ann. § 3–214.

## B. *The Suit*

Appellant Center for Auto Safety, Inc. ("CAS") is a non-profit consumer advocacy organization incorporated in Washington, D.C. Its activities include, among others, engaging in direct-mail solicitations to non-members. CAS estimates that it sends out approximately 200,000 to 250,000 mailings on an annual basis, including 15,000 mailings to Maryland residents. It receives annual contributions totaling in excess of $100,001, and thus must pay an annual fee of $200 to solicit contributions in Maryland. After refusing to pay the $200 fee, CAS brought this suit against Maryland's Secretary of State,[4] claiming that the statutory fee violates CAS's rights under the First Amendment, the Due Process Clause of the Fourteenth Amendment,[5] and the Commerce Clause. The dis-

---

1. While the complete Charitable Organizations Solicitation Law is lengthy, covering more than twenty pages in the Maryland Code, only the following provisions are directly relevant to the instant constitutional challenge:

    § 3–202. Registration of charitable organizations; required reports.
    (a) Every charitable organization located in this State which intends to solicit contributions within or without this State, or every charitable organization which intends to solicit contributions within this State or to have funds solicited on its behalf shall file a registration statement with the Secretary of State ... prior to or upon the commencement of any solicitation.

    (g)(1) Every charitable organization under this subtitle which files a separate registration statement shall pay an annual fee based upon the level of public contributions collected. The annual fee due is as follows:

| Level of Public Contributions | Annual Fee |
| --- | --- |
| At least $25,000 but less than $50,001 | $50 |
| At least $50,001 but less than $75,001 | $75 |
| At least $75,001 but less than $100,001 | $100 |
| $100,001 and above | $200 |

2. Certain charitable organizations are exempt under Md.Code Ann. § 3–203. This exemption does not apply here.

3. The Statute imposes a number of other responsibilities on charitable organizations. *See, e.g.,* Md.Code Ann. § 3–204 (regulating contents and filing of contracts with fundraising counsel or professional solicitors), § 3–205 (activity limitations and disclosure requirements), § 3–210 (maintenance of records), and § 3–212 (prohibited acts and practices).

4. The Secretary of State has statutory responsibility for enforcement of the Statute.

5. CAS has abandoned this claim.

trict court granted the Secretary's motion for summary judgment, thereby upholding the constitutionality of the challenged law. This appeal followed.

## II.

This case was decided below on the parties' cross-motions for summary judgment. Therefore, the standard of review is *de novo*. *See Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F.2d 931, 938 (4th Cir.1991).

## III.

Central to the Commerce Clause analysis here is whether the Statute constitutes (1) a general revenue tax or (2) a "user fee" assessed to defray the costs of state-provided services. Different constitutional standards apply to each.

■ General revenue taxes are state taxes levied against interstate commerce to raise general revenue. These taxes raise the difficult problem of "reconciling unrestricted access to the national market with each State's authority to collect its fair share of revenues from interstate commercial activity." *American Trucking Ass'ns v. Scheiner*, 483 U.S. 266, 269, 107 S.Ct. 2829, 2832, 97 L.Ed.2d 226 (1987). To assure that revenue taxes do not violate the principle that "no State may discriminate against interstate commerce by enacting a tax which provides a competitive advantage to local business," *id.* (citing *Dean Milk Co. v. Madison*, 340 U.S. 349, 356, 71 S.Ct. 295, 298–99, 95 L.Ed. 329 (1951)), the Supreme Court has required that any state tax on interstate commerce must be (1) applied to an activity with a substantial nexus with the taxing State, (2) fairly apportioned, (3) nondiscriminatory against interstate commerce, and (4) fairly related to the services provided by the state, in order to pass constitutional muster. *Complete Auto Transit,*

*Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).

■ This stringent standard, however, does not apply when the state tax at issue qualifies as a "user fee." "User fees" are taxes or other fees collected by the state as reimbursement for use of state-owned or state-provided facilities or services. *See Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 621, 101 S.Ct. 2946, 2955, 69 L.Ed.2d 884 (1981); *Evansville–Vanderburgh Airport Authority District v. Delta Airlines*, 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972). The Supreme Court has drawn a clear distinction between user fees and general revenue taxes, noting that "[b]ecause [user fees] are purportedly assessed to reimburse the State for costs incurred in providing specific quantifiable services," they "are not true revenue measures and ... the considerations applicable to ordinary tax measures do not apply." *Commonwealth Edison*, 453 U.S. at 622 n. 12, 101 S.Ct. at 2956 n. 12 (citing *Clark v. Paul Gray, Inc.*, 306 U.S. 583, 599, 59 S.Ct. 744, 753, 83 L.Ed. 1001 (1939), and P. Hartman, State Taxation of Interstate Commerce 20, n. 72 (1953)). The rationale for this distinction is that, where taxes are narrowly drawn to reimburse a state for its expenses, the possibility that the tax will discriminate against interstate commerce is sharply diminished.

■ To qualify as a user fee, a state tax must (1) reflect a fair, if imperfect, approximation of the cost of using state facilities for the taxpayer's benefit, (2) not discriminate against interstate commerce, and (3) not be excessive in relation to the costs incurred by the taxing authorities. *Evansville–Vanderburgh Airport Authority District v. Delta Airlines*, 405 U.S. 707, 717–20, 92 S.Ct. 1349, 1355–57, 31 L.Ed.2d 620 (1972).[6] Tax statutes meeting these three criteria qualify as

---

6. Despite CAS's argument to the contrary, *Evansville–Vanderburgh* is still valid, binding precedent. The Supreme Court has signaled no disapproval of the decision, nor any intention to limit or overrule it. To the contrary, the Court has cited and quoted from the decision on several occasions. *See American Trucking Ass'ns v. Scheiner*, 483 U.S. 266, 296, 107 S.Ct. 2829, 2847, 97 L.Ed.2d 226 (1987) (noting that "the Commerce Clause does not require the States to

avoid flat taxes when they are the only practicable means of collecting revenues from users and the use of a more finely gradated user-fee schedule would pose genuine administrative burdens."); *see also Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 621–22, 101 S.Ct. 2946, 2955–56, 69 L.Ed.2d 884 (1981) (citing *Evansville–Vanderburgh* as authority for proper analysis of user fees).

user fees and therefore pass constitutional muster. *Id.* at 716–17, 92 S.Ct. at 1355–56; *see also American Trucking,* 483 U.S. at 289–91, 107 S.Ct. at 2843–44.

## IV.

These principles, applied to the case at bar, point persuasively to the conclusion that the sliding scale fee imposed under the Maryland Statute is a constitutionally sound user fee. To begin with, Maryland's fee structure represents a fair, if imperfect, approximation of the cost of using Maryland facilities and services for the charity's benefit. As the district court found, the record clearly shows that the Secretary's costs of monitoring charities increase with larger charities. This cost increase arises because larger charities generally generate more registration and renewal documents to review, require more research relating to administrative, management, and membership activities, and give rise to more public inquiries, more paperwork requiring data entry, and more investigative effort. Although it is true that any particular large charity may not generate higher costs, the Commerce Clause does not require that user fees be precisely correlated to actual use that a party makes of government services. *See United States v. Sperry Corp.,* 493 U.S. 52, 60, 110 S.Ct. 387, 393–94, 107 L.Ed.2d 290 (1989); *Evansville–Vanderburgh,* 405 U.S. at 716, 92 S.Ct. at 1355. Instead, recognizing the insurmountable administrative burdens arising from a more stringent requirement, the Court has required only that the fee be based on a "fair approximation of the cost of benefits supplied." *Sperry,* 493 U.S. at 60, 110 S.Ct. at 394 (citing *Massachusetts v. United States,* 435 U.S. 444, 463 n. 19, 98 S.Ct. 1153, 1165 n. 19, 55 L.Ed.2d 403 (1978)). Here, because a charity's fee is directly related to the workload the charity is expected to create for the Secretary, the sliding scale fee is a fair, if imperfect, approximation of Maryland's

costs, thus satisfying the first prong of the *Evansville–Vanderburgh* test.

Next, Maryland's sliding scale fee does not discriminate against interstate commerce. The fee imposed does not differentiate between Maryland-based charities and charities based out-of-state. For example, all charities generating $50,000 in nationwide contributions are subject to the same registration fee, without regard to location. Nor are the registration fees excessive in relation to the costs incurred by Maryland. The parties do not dispute that the total amount raised through registration fees did not exceed the funds necessary to cover Maryland's administration and enforcement of the Statute. Therefore, because the Statute fulfills the three requirements of the *Evansville–Vanderburgh* standard, it is properly viewed as a user fee.[7] CAS's principal argument to the contrary is that Maryland does not provide charities with "services," as that term has been used in opinions upholding taxes as "user fees." Citing *Commonwealth Edison* and *Evansville–Vanderburgh,* CAS argues that the user fee analysis is only applicable when a state seeks to recoup the costs of operating a specific state facility or of providing specific quantifiable services. CAS contends that the Statute does not qualify for such treatment because Maryland does not assist charities in their solicitations, for example by providing printing or distribution aids. Further, CAS, which solicits only by mail, does not use Maryland's sidewalks or highways.

Though not without some appeal, this argument ultimately fails. The sliding scale fee, although not the typical user fee, nonetheless fits comfortably within the user fee category. Typical user fees involve users deriving benefits from the use of state facilities such as roads, highways, and airports. Here, charities seeking to solicit in Maryland use the state's apparatus for regulating charities[8] and, as a result, derive a benefit, name-

---

7. Given this conclusion, it is not necessary to consider whether the fee could also be justified as a general revenue tax under other case authority. *See New Hampshire Motor Transport Ass'n v. Flynn,* 751 F.2d 43, 50 (1st Cir.1984).

8. Maryland's regulation of charities includes the collection and review of registration and financial information of charities seeking to solicit in Maryland. The Secretary of State's office also responds to telephone and written inquiries regarding charities, conducts public education lectures, and investigates complaints about chari-

ly the privilege of soliciting in Maryland where donor confidence is enhanced owing to the state's regulation of charities.[9] But unlike the typical user fee situation, where a user's out-of-state activities are irrelevant, the out-of-state activities of the assessed charities are directly relevant to Maryland's regulatory efforts. To protect and inform her citizens, Maryland must examine the overall activities of charities, not just the charities' activities that occur within Maryland.[10] For all these reasons, the Statute's sliding scale fee is correctly viewed as a "user fee," paid by charities for the benefits received from Maryland.

■ CAS also challenges the application of user fee analysis here because the Secretary does not keep the registration fees in a separate fund, but rather turns them over to the state treasury. This argument also fails, for *Evansville* makes clear that it is immaterial where the funds are deposited and whether those specific funds are the funds eventually used to effectuate the Statute's purpose. *Evansville–Vanderburgh*, 405 U.S. at 720, 92 S.Ct. at 1357; *see also New Hampshire Motor Transport Ass'n v. Flynn*, 751 F.2d 43, 49 (1st Cir.1984) (noting that "[t]he Commerce Clause does not require states or courts to trace individual dollars").

In sum, the Statute's sliding scale fee system meets the *Evansville–Vanderburgh* test for user fees. It is, therefore, a user fee that does not violate the Commerce Clause.

## V.

■ Next, we must determine whether the Statute violates the First Amendment. To begin, it is clear that charitable solicitations, such as those conducted by CAS, involve a variety of speech falling within the scope of First Amendment protection. *See Schaumburg v. Citizens for Better Environment*, 444 U.S. 620, 632, 100 S.Ct. 826, 833–34, 63 L.Ed.2d 73 (1980). And, it is equally clear that while the exercise of Constitutionally protected activities may not be taxed, it may be regulated, provided the regulation is narrowly tailored to achieve a legitimate governmental interest, is content-neutral in terms and effect, and does not unduly burden speech. *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), illustrates this principle. There, the Supreme Court reviewed a New Hampshire statute requiring that a special license be obtained prior to any public parades or processions on public streets. License applicants were required to pay a sum not to exceed $300.00 a day "for the use of the city or town." In upholding the statute, the Supreme Court

ties. According to the Assistant Secretary of State, the largest single activity in the Office of the Secretary of State is the administration and enforcement of the Maryland laws governing charitable organizations. Four employees staff the Charitable Division of the Office of the Secretary of State, and, whenever the workload demands, employees from other divisions are brought in to supplement the Charitable Division staff.

9. While the state's regulatory efforts clearly provide a service to the citizenry of Maryland, they also benefit charities seeking to solicit in Maryland by eliminating illegitimate charities and enhancing public confidence in charities. As a result, the level of charitable giving will tend to increase, as citizens are more likely to donate to charities that have been investigated and found to be reputable. In addition, each charity's share of available funds may increase because, as illegitimate charities are weeded out, the amount of available funds will be spread among a smaller pool of charities.

One might query whether a large nationwide charity that solicits from only one Maryland citizen benefits from increased donor confidence

more than a small in-state charity that solicits statewide. The short answer to this question is that both enjoy the opportunity to solicit statewide in an environment of enhanced public confidence. It follows, therefore, that a national charity soliciting from only one Maryland citizen either (1) chooses not to take full advantage of the statewide increased consumer confidence, or (2) is unsuccessful, for some reason, in its solicitation of other Maryland citizens. *See Evansville–Vanderburgh*, 405 U.S. at 716–17, 92 S.Ct. at 1355 (a fee passes constitutional muster if it "is based on some fair approximation of use *or privilege of use ....*") (emphasis added).

10. For example, suppose a large national charity carefully uses 90% of the modest amount of funds it raises in Maryland for charitable purposes, but funnels 75% of the much larger amount of funds it raises nationwide for its directors' extravagant salaries. In short, Maryland and her citizens surely have a legitimate interest in what this and other charities do with the funds they raise outside of Maryland.

affirmed the principle that fees that serve not as revenue taxes, but rather as means to "meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed," do not violate the Constitution. *Cox*, 312 U.S. at 577, 61 S.Ct. at 766; *see also Murdock v. Pennsylvania*, 319 U.S. 105, 113–14, 63 S.Ct. 870, 875, 87 L.Ed. 1292 (1943) (striking down a license tax which was not "a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question"); *Streich v. Pennsylvania Com. on Charitable Organizations*, 579 F.Supp. 172, 177 (M.D. Pa.1984) ("Nominal fees imposed to defray the costs of policing the activities in question are allowed."). An important ingredient in the Court's conclusion was the recognition that "[t]here is no evidence that the statute has been administered otherwise than in the fair and non-discriminatory manner which the state court has construed it to require." *Cox*, 312 U.S. at 577, 61 S.Ct. at 766.

But the power to impose a fee or require a permit in the speech context has important limits, as *Forsyth County v. Nationalist Movement*, — U.S. ——, ——, 112 S.Ct. 2395, 2399, 120 L.Ed.2d 101 (1992), lucidly illustrates. There, an ordinance required that private organizations and groups obtain a license prior to engaging in demonstrations on public lands. License applicants were required to pay a fee in an amount to be fixed by the County's Board of Commissioners, but not to exceed $1000.00 per day. The county administrator was empowered to adjust the fee amount "in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed." *Id.* In striking down the ordinance as facially invalid, the Court noted that ordinances regulating speech and imposing fees must not delegate overly broad licensing discretion to a government official, because " 'such discretion has the potential for becoming a means of suppressing a particular point of view.' " *Id.* at ——, 112 S.Ct. at 2401 (quoting *Heffron v. International Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 649, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981)). Significantly, the Supreme Court found that the ordinance,

as construed by the County, was not content-neutral because the fee was based upon the administrator's discretionary assessment of the amount of hostility likely to be created by the speech based on its content. *Id.* —— U.S. at ——, 112 S.Ct. at 2403.

The Statute at issue and the fees it imposes represent a narrowly tailored governmental regulation of speech, one that is essentially similar to that upheld in *Cox*, and yet sharply different from the ordinance struck down in *Forsyth County*. In contrast with the ordinance struck down in *Forsyth County*, where the administrator "based the fee on his own judgment of what would be reasonable," *Id.* at ——, 112 S.Ct. at 2402, Maryland licensing officials are afforded no discretion in imposing an appropriate fee. Instead, the fees assessed by Maryland are statutorily set in fixed steps corresponding to a charity's nationwide contribution level. Accordingly, Maryland officials cannot manipulate the Statute's fee discriminatorily in order to censor or limit a charity's First Amendment rights. Moreover, the fees assessed by Maryland are content-neutral. Charities generating comparable levels of nationwide contributions are subject to the same fee, regardless of the nature of the causes espoused by a charity and regardless of the government's opinion of the causes.

Like the fees imposed in *Cox*, the fees assessed by Maryland under the Statute are narrowly tailored to further a legitimate governmental purpose. In *Cox*, the fees enabled the state to police public demonstrations and maintain the public order; here, the fees enable the state to prevent fraud by charities soliciting funds in Maryland. As in *Cox*, the Maryland fees are calibrated to approximate the costs of administering the Statute, and the revenues raised by the fees do not exceed these costs. As such, the fees do not unduly or impermissibly burden speech. And finally, as in *Cox*, there is no evidence that the Statute has been applied in a discriminatory manner.

Therefore, because the Statute's sliding scale is narrowly tailored to match the costs incurred by Maryland in implementing the Statute, because the Secretary does not exer-

cise discretion in the imposition of the fee, and because the fees imposed are content-neutral and do not unduly burden speech, the Statute does not violate the First Amendment.

Accordingly, the district court's order granting summary judgment for the Secretary is

*AFFIRMED.*