**AMERICAN TARGET ADVERTISING, INC., a Virginia Corporation,**
**Plaintiff,**

v.

**Francine A. GIANI in her official capacity as Division Director of the Utah Division of Consumer Protection, Department of Commerce for the State of Utah, Defendant.**

No. 2:97CV610 B.·

United States District Court,
D. Utah,
Central Division.

Aug. 19, 1998.

---

Mark F. Fitzgibbons, F. Hayden Codding, Fairfax, VA, for Plaintiff.

Jeffrey Gray, Rebbecca D. Waldron, Salt Lake City, UT, for Defendant.

## MEMORANDUM OPINION AND ORDER

BENSON, District Judge.

Plaintiff American Target Advertising, Inc., a Virginia corporation, is a political consulting firm specializing in political fund-raising. American Target filed this lawsuit against Defendant Francine Giani in her official capacity as Director of the Division of Consumer Protection of the Utah Department of Commerce, seeking to enjoin Utah's enforcement of the Utah Charitable Solicitations Act, codified at Utah Code Ann. § 13–22–1 *et seq.*

Cross–Motions for Summary Judgment are before the Court.

## I. BACKGROUND

### A. The Statute

The Utah Charitable Solicitations Act (the Act), codified at Utah Code Ann. § 13–22–1 *et seq.*, establishes a regulatory system for licensing out-of-state professional fund-raising consultants. Under the Act, fund-raising consultants must (1) apply for a license from the state, (2) make financial disclosures to the Utah Division of Consumer Protection, (3) pay a $250 annual registration fee, and (4) secure a $25,000 bond or letter of credit before their clients can solicit contributions in Utah.

After the State has received an application from an out-of-state fund-raising consultant, the Division has ten business days within which to approve or deny the application. Utah Admin.Code R152–22–4(3). The application may be denied or revoked if such action is in the public interest *and* upon a finding that (1) the application for registration or renewal is incomplete or misleading in any material respect; (2) the applicant has violated the Act or failed to pay a fine imposed under the Act, (3) the applicant has been convicted of a crime involving moral turpitude; (4) an injunction or administrative order has been entered against the applicant in which there was a finding or admission of fraud, breach of fiduciary duty, material misrepresentation, or where the injunction or order was based on a finding of lack of integrity, dishonesty, or mental incompetence of the applicant; (5) the consultant has materially misrepresented or caused to be misrepresented the purpose and manner in which contributed funds and property will be used in connection with any solicitation; (6) the consultant has failed reasonably to supervise its agents or employees, (7) the consultant has used, or attempted to use a name that either is deceptively similar to a name used by an existing registered or exempt charitable organization, or appears reasonably likely to cause confusion of names; or (8) the consultant has failed to secure and/or maintain a $25,000 bond or letter of credit. Utah Code Ann. § 13–22–12.

Those who violate the Act are subject to administrative, civil, or criminal enforcement action. The Director may initiate administrative action to (1) suspend or revoke the registration, (2) order that the consultant cease and desist from its unlawful conduct, or (3) impose an administrative fine. Utah Code Ann. §§ 13–2–3, 6, 12. Any such action is subject to provisions of the Administrative Procedures Act, Utah Code Ann. § 63–46b–1 *et seq.*, which guarantees the consultant's right to notice and a hearing.

The Division may also seek damages, civil penalties, and injunctive relief in state district court. Utah Code Ann. § 13–22–3. Any civil judgment rendered or administrative fine imposed against a consultant for violating the Act may be recovered from the bond or letter of credit posted by the consultant. Utah Admin.Code R152–22–6 (1996). Any fine or civil penalty imposed must be excused unless it appears, by a preponderance of the evidence, that the consultant

acted in bad faith or with intent to harm the public. Utah Code Ann. § 13–22–3(5).

## B. Events Leading to this Lawsuit

Plaintiff American Target Advertising, Inc. is a Virginia corporation that provides fund-raising services to nonprofit organizations. On behalf of its clients, American Target uses direct mail to solicit funds from the general public. American Target was retained by Judicial Watch, a nonprofit "political watchdog" organization incorporated in the District of Columbia, to plan, manage, and prepare materials relating to Judicial Watch's nationwide information distribution and fund-raising program.

In February, 1997, Judicial Watch applied for a fund-raising license with the Utah Division of Consumer Protection. The Division informed Judicial Watch that it would be ineligible for a license unless (a) American Target registered with the Division, (b) Judicial Watch agreed not to pay American Target for its fund-raising consulting services, or (c) Judicial Watch agreed not to use American Target's services in connection with Judicial Watch's fund-raising activities in Utah.

Three months later, the Division granted Judicial Watch a fund-raising license. However, the Division made clear that the issuance of the permit was contingent upon Judicial Watch's promise not to use the services of any professional fund-raising consultant not licensed in Utah in connection with it's fund-raising activities in Utah.

American Target then filed this lawsuit, claiming that the Utah Charitable Solicitations Act is unconstitutional under the First Amendment, the Commerce Clause, and the Due Process Clause of the Fourteenth Amendment. After filing the Complaint, American Target filed a Motion for a Preliminary Injunction. Defendant agreed to the entry of an Order suspending enforcement of the Act with respect to American Target and Judicial Watch during the pendency of this lawsuit. American Target then filed a Motion for Summary Judgment. Defendant opposed that Motion and filed her own Motion for Summary Judgment.

The parties have conducted limited discovery, having taken the depositions of James E.B. Carney, Vice President of American Target, and Francine A. Giani, Director of the Utah Division of Consumer Protection. The parties have filed a Stipulation of Facts, setting forth facts as to which there is no dispute.

## II. DISCUSSION

### A. Constitutionality Under the First Amendment

It is beyond dispute that any law that restricts charitable solicitations is subject to First Amendment scrutiny. As the Supreme Court noted in *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), charitable solicitations "involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." *Id.* at 632, 100 S.Ct. 826.

However, it is equally well-settled that "[s]oliciting financial support is ... subject to reasonable regulation." *Id.* at 632, 100 S.Ct. 826. In order to survive a First Amendment challenge, a law that regulates charitable solicitations must (1) serve a substantial governmental interest, and (2) be "narrowly drawn ... to serve th[at] interest[ ] without unnecessarily interfering with First Amendment freedoms." *Id.* at 637, 100 S.Ct. 826. *See also, Maryland v. Joseph H. Munson Company, Inc.*, 467 U.S. 947, 961, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 792, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988).

### 1. Substantial Interest

First, the Court must determine whether Utah's interest in enacting the legislation is substantial. The State's interest will be deemed substantial if the statute was enacted to " 'protect[ ] the public from fraud, crime, and undue annoyance.' " *Village of Schaumburg*, 444 U.S. at 635, 100 S.Ct. 826.

The stated purpose of the Act is "to protect [Utah] citizens from harmful and injurious acts." Utah Code Ann. § 13–1–1. The Act seeks to fulfill this purpose by (1) preventing fraud and (2) providing a means of redress for victims of fraud.

It is undisputed that these interests are substantial, and based in part on past experience with persons who have used charitable fund-raising activities as vehicles for fraud. The Supreme Court has held that "[t]he interest in protecting charities (and the public) from fraud is, of course, a sufficiently substantial interest to justify a narrowly tailored regulation." *Riley v. National Federation of the Blind,* 487 U.S. 781, 792, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988).

### 2. Narrow Tailoring

■ The second prong of the test requires the Court to determine whether the Act is narrowly tailored. Under this standard, the challenged statute need not constitute the "least restrictive means" of obtaining the legislative objective. *See e.g., Maryland v. Joseph H. Munson Co., Inc.,* 467 U.S. 947, 961, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). In clarifying this standard, the Supreme Court has held that a law is narrowly tailored if it "promotes a substantial governmental interest that would be achieved less effectively absent the regulation." *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

American Target argues that four aspects of the Act fail under the narrow tailoring requirement: (1) the registration and disclosure requirement; (2) the registration fee; (3) the bond or letter of credit requirement; and (4) the allegedly overbroad discretion of the Director of the Division of Consumer Protection.

### a. The Registration & Disclosure Requirement

The Act requires fund-raising consultants such as American Target to provide the Divi-

sion with information about the consultant and its relationship with the charity it consults. The Act also requires the consultant to disclose the nature of any law enforcement actions taken against the consultant, its operators, principals, directors, officers, or managers. Utah Code Ann. § 13–22–9. Consumers may access this information from the State to verify representations made in solicitations and to assess the reliability and trustworthiness of those who participate in the solicitation process.

The Utah Act's registration and disclosure requirements appear to be consistent with the provisions upheld in *Riley v. Federation of the Blind of North Carolina,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). In that case, the Court declared several provisions of North Carolina's charitable solicitations law unconstitutional, but explained that "North Carolina may constitutionally require fund-raisers to disclose certain financial information to the State, as it has since 1981." 487 U.S. at 795, 108 S.Ct. 2667. The Utah Act's registration and disclosure requirements do not differ materially from those upheld in *Riley.*

The registration and disclosure requirements are narrowly tailored to enable private citizens to protect themselves from fraudulent activity. The information required is relatively simple and readily available to the consultant. As American Target concedes, much of the information required is already available in its own tax forms and fundraising registration materials in Virginia. The Court concludes that the Act's disclosure and registration requirements are sufficiently narrowly tailored to pass constitutional muster.[1]

---

1. American Target also argues that the registration and disclosure requirements amount to an unconstitutional prior restraint because consultants must register prior to conducting solicitations. In support of this argument, American Target points out that the Court in *Riley* struck down a provision requiring the fund-raiser to obtain a license before soliciting.

But the fatal flaw in the North Carolina licensing scheme is not present in the Utah Act. As the Court observed, licensing requirements "must provide that the licensor 'will, within a specified

brief period, either issue a license or go to court.'" *Id.* at 802, 108 S.Ct. 2667 (quoting *Freedman v. Maryland,* 380 U.S. 51, 59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)). The Court struck down the law because it did not impose a time limitation on the licensing agency, either by statute or administrative regulation. *Id.*

Utah's Act contains no such defect. By administrative regulation, the Division must process registration applications "within 10 business days of their receipt by the Division." Utah Admin.Code R152–22–4(3). In this way, the Di-

### b. The Registration Fee

American Target also argues that the $250.00 annual registration fee fails under the narrow tailoring requirement. American Target claims that the fee will make the cost of fund-raising so high that mass-mailed interstate charitable solicitations will become impossible.

In considering the constitutional permissibility of registration fees imposed upon professional charitable solicitors in the state of New York, the United States Court of Appeals for the Second Circuit observed:

> It is well-settled that charitable solicitation involves a variety of speech interests protected by the First Amendment. "[I]t is equally clear that while the exercise of constitutionally protected activities may not be taxed, it may be regulated, provided the regulation is narrowly tailored to achieve a legitimate government interest, is content-neutral in terms and effect, and does not unduly burden speech." Thus, fees that serve not as revenue taxes, but rather as means to meet the expenses incident to the administration of a regulation and to the maintenance of public order in the matter regulated are constitutionally permissible.

*National Awareness Foundation v. Abrams,* 50 F.3d 1159, 1164–65 (2d Cir.1995) (quoting *Center for Auto Safety, Inc. v. Athey,* 37 F.3d 139, 144 (4th Cir.1994)) (citations omitted); *see also Dayton Area Visually Impaired Persons, Inc. v. Fisher,* 70 F.3d 1474 (6th Cir.1995) (upholding a $200 registration fee for professional solicitors).

American Target's attempt to distinguish *National Awareness Foundation v. Abrams* and *Dayton Area Visually Impaired Persons, Inc. v. Fisher* is unpersuasive. American Target argues that these cases are different than the case at bar because they deal with solicitors rather than professional fund-raising counsel. American Target argues that "solicitors" actually perform the act of soliciting money, and typically have possession over the funds that are contributed. But it is beyond dispute that American Target exercises significant control over the

fund-raising and the money. Therefore, the fact that American Target refers to itself as "counsel" rather than as a "solicitor" is irrelevant for our purposes here.

The fee provisions enable the State to defray the costs associated with the administration and enforcement of the Act. The Act itself mandates that the Division set an application fee that is "reasonable, fair, and reflect[s] the cost of services provided." Utah Code Ann. § 13–22–9(1)(a); Utah Code Ann. § 63–3 8–3.2(2). The evidence suggests that the Division complies scrupulously with this mandate, considering the resources it expends in administering and enforcing the Act in establishing the fee. Giani Affidavit, ¶ 7. No evidence in the record suggests that the fee is anything to the contrary. Therefore, the application fee survives constitutional scrutiny.

### c. The Bond or Letter of Credit Requirement

For some of the same reasons, American Target argues that the requirement that consultants maintain a bond or letter of credit is unconstitutional. American Target claims that the requirement is more burdensome than necessary, and is not narrowly tailored to serve the State's interest of preventing fraud.

The Court is not convinced. This requirement protects the public by providing a fund from which victims can draw in the event that they are defrauded by charitable solicitors. Simultaneously, it also acts as a deterrent to fraudulent activity—presumably, fund-raisers will be less likely to defraud Utahns if they know that if they get caught, they will pay for it.

The United States Court of Appeals for the Sixth Circuit recently upheld Ohio's $20,000 bonding requirement, concluding that "because the bonding requirement imposed upon professional solicitors also attempts to deter fraud and to provide a fund from which to compensate charities for moneys lost or misappropriated by the professional solicitors, the district court [correctly] concluded

---

vision can fairly review the application while preserving the First Amendment rights of the

consultant by assuring a prompt decision.

that the requirement was narrowly tailored to serve a legitimate state interest." *Dayton Area Visually Impaired Persons, Inc. v. Fisher,* 70 F.3d 1474, 1486 (1995).

Similarly, the bonding or letter of credit requirements in the Utah Act are narrowly tailored to serve the substantial interest of the State in protecting charities and Utah residents from fraud. The State has not required consultants to deposit the entire $25,000 with the State or in an escrow account. Instead, the State has imposed the less-burdensome requirement that the consultant obtain either a bond from a surety company or a letter of credit from the consultant's financial institution. This provides the public with a source from which to draw in the event of loss.

The purpose of the Act could not be accomplished as effectively without such the bond or letter of credit requirement. Accordingly, it survives the scrutiny of the First Amendment.

#### d. Improper Discretion

Finally, American Target argues that the Act gives the Director of the Division of Consumer Protection improper discretion in issuing fund-raising licenses. The Director may deny or revoke a license if (1) such action is in the public interest and (2) after making a specified finding of wrongdoing under the Act. Utah Code Ann. § 13–22–12. American Target claims that this provision gives the Director unbridled discretion because neither the Act nor any administrative regulations pertaining to its enforcement define what "public interest" is.

However, the Act requires that the Director make a specified finding of wrongdoing before denying or revoking a license. The provision governing specified findings of wrongdoing is quite narrow, giving the Director discretion only where (1) the application for registration or renewal is incomplete or misleading in any material respect; (2) the applicant has violated the Act or failed to pay a fine imposed under the Act, (3) the applicant has been convicted of a crime involving moral turpitude; (4) an injunction or administrative order has been entered against the applicant in which there was a finding or admission of fraud, breach of fiduciary duty, material misrepresentation, or where the in-

junction or order was based on a finding of lack of integrity, dishonesty, or mental incompetence of the applicant; (5) the consultant has materially misrepresented or caused to be misrepresented the purpose and manner in which contributed funds and property will be used in connection with any solicitation; (6) the consultant has failed reasonably to supervise its agents or employees, (7) the consultant has used, or attempted to use a name that either is deceptively similar to a name used by an existing registered or exempt charitable organization, or appears reasonably likely to cause confusion of names; or (8) the consultant has failed to secure and/or maintain a $25,000 bond or letter of credit. Utah Code Ann. § 13–22–12.

Because the Director may only invoke her discretion after making a specific finding of wrongdoing in these limited areas, her discretion is quite narrow. In addition, the "public interest" language also places a limitation on the Director's discretion.

The denial and revocation provision does not give the Director undue discretion, and appears reasonably calculated to give the Act reasonable regulatory teeth. The Act could not be enforced as effectively without the provision. Accordingly, the Court concludes that it is narrowly tailored to further the purpose of the Act.

### B. Constitutionality Under the Commerce Clause

The Commerce Clause gives Congress the power to regulate commerce "among the several States." United States Constitution Art. 1 § 8, cl. 3. This power is significant in two respects. First, is operates as an affirmative grant of authority, enabling Congress to enact legislation in areas that substantially affect interstate commerce. Second, and relevant here, it limits the states' police powers by prohibiting state regulations that unduly burden interstate commerce. This limitation of state authority, commonly referred to as the "dormant" Commerce Clause, "is by no means absolute. In the absence of conflicting federal legislation, the States retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though inter-

state commerce may be affected." *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 35, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980).

The text of the Commerce Clause provides no guidance on the extent to which states can regulate interstate commerce in the absence of Congressional legislation. It has therefore been left to the courts to delineate the Commerce Clause-imposed boundaries of state regulation.

■ A state law may be found unconstitutional under the dormant Commerce Clause in either of two situations—either (1) where the state regulation directly regulates or otherwise discriminates against interstate commerce, *see e.g., Oregon Waste Systems v. Department of Environmental Quality of the State of Oregon,* 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994), or (2) where the regulation operates in a non-discriminatory manner, burdening interstate commerce only indirectly, and the burden imposed upon interstate commerce is clearly excessive in relation to the putative local benefits, *see e.g., Pike v. Bruce Church Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

## 1. Direct Regulation of Interstate Commerce

■ American Target first argues that, through the framework established by the Utah Charitable Solicitations Act, the State of Utah is attempting to directly regulate contractual agreements between American Target and its nonprofit clients in other states. While acknowledging that the Act does not discriminate against interstate commerce on its face, American Target claims that the Utah Act is similar to the statute declared unconstitutional in *Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) in that it attempts to directly regulate the out-of-state contracts of an out-of-state person, and therefore constitutes a virtual *per se* violation of the Commerce Clause.

In *Brown–Forman,* a distiller brought suit when the State of New York began requiring all liquor distillers doing business in New York to sell at a price no higher than the lowest price that the distiller charged anywhere else in the United States. The Supreme Court held that the statute violated the dormant Commerce Clause. Rather than relying on a discrimination rationale,[2] however, the Court attacked the law on grounds that it enabled New York to "project its legislation into" other states. The Court reasoned that the New York law

[R]egulate[d] out-of-state transactions in violation of the commerce clause. Once a distiller has posted prices in New York, it is not free to change its prices elsewhere in the Untied States during the relevant month. **Forcing a [business entity] to seek regulatory approval in one state before undertaking a transaction in another directly regulates interstate commerce.** While New York may regulate the sale of liquor within its borders, and may seek low prices for its residents, it may not "project its legislation into [other states] by regulating the price to be paid" for liquor in those states.... That the [law] is addressed only to sales of liquor in New York is irrelevant if the "practical effect" of the law is to control liquor prices in other states.... Moreover, the proliferation of [similar state] laws ... has greatly multiplied the likelihood that a seller will be subjected to inconsistent obligations in different states.... Thus New York has "project[ed]" its legislation into other states, and directly regulated commerce therein, in violation of [the dormant Commerce Clause].

*Brown–Forman,* 476 U.S. at 582–83, 106 S.Ct. 2080 (emphasis added) (citations omitted).

American Target analogizes its own plight to that of the plaintiff/distiller in *Brown–Forman,* arguing that Utah attempted to regulate American Target, an out-of-state business. In support of this argument, American Target points out that the Division of Consumer Protection denied Judicial Watch a license because of its relationship with American Target. Even when the Divi-

2. The Court declined using the discrimination rationale because the appellant conceded that the statute was "evenhanded."

sion later granted the license, it did so only on condition that Judicial Watch not correspond with Utah residents using materials developed with any assistance from American Target.

The Court is not persuaded. Unlike the *Brown–Forman* plaintiff, American Target's out-of-state activities are not being controlled by an overreaching state statute. American Target is subject to Utah regulation only to the extent that it provides consulting services in connection with charitable solicitations in Utah.

In no way does the Act regulate American Target's consulting services that do not pertain to charitable solicitations in Utah. Simply stated, the Act is not unconstitutional under *Brown–Forman* because it does not have the " 'practical effect' of ... controll[ing] [professional fund-raisers] in other states." *Id.* at 582–83, 106 S.Ct. 2080.

**2. Indirect Regulation of Interstate Commerce**

The Supreme Court's ruling in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) is said to embody the modern negative Commerce Clause test in cases that do not involve facially discriminatory state regulations. In *Pike,* the Court held that the State of Arizona could not require Arizona cantaloupe growers to package their produce in Arizona. The Court explained that where the challenged state statute "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental" the statute will survive a dormant Commerce Clause attack unless the burden on interstate commerce is "clearly excessive in relation to the putative local benefits." *Pike,* 397 U.S. at 142, 90 S.Ct. 844.

 While acknowledging that Utah has a "legitimate local public interest" in enforcing the Act, American Target argues that the Act unduly burdens interstate commerce by imposing: (1) the annual application fee of $250.00, (2) the $25,000 bonding requirement, and (3) the registration and disclosure requirements. The party challenging a nondiscriminatory statute under the dormant Commerce Clause "bears the burden of showing that the incidental burden on inter-

state commerce is excessive compared to the local interest." *Dorrance v. McCarthy,* 957 F.2d 761, 763 (10th Cir.1992). American Target has failed to produce any evidence showing that the incidental burdens that the Act may impose on interstate commerce are clearly excessive in relation to the benefits that the Act produces.

Moreover, as explained above in the Court's discussion of American Target's First Amendment claims, the challenged provisions are reasonably necessary to prevent and remedy the effects of fraud. Any resulting burdens on interstate commerce are minimal by comparison. Accordingly, the Court concludes that the Act does not run afoul of the dormant Commerce Clause under the *Pike v. Bruce Church* balancing test.

**C. The Charitable Solicitations Act Does Not Violate the Due Process Clause.**

 American Target also contends that the Act is invalid under the Due Process Clause of the Fourteenth Amendment, arguing that applying the Act to American Target constitutes "an impermissible extra-territorial exercise of the State's police powers." Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 24.

The Court does not agree. American Target plays a most significant role in Judicial Watch's solicitations, including those directed toward Utah. A reading of the Contract between Judicial Watch and American Target reveals that American Target (1) prepares the creative copy and design of the mailings, (2) plans and manages the production services relevant to direct mail solicitations, (3) selects lists of potential donors and identifies dates when mailings should occur, and (4) generally advises Judicial Watch regarding the solicitations. Agreement Between Judicial Watch and American Target, Complaint Exhibit 1, § 1. It is safe to say that American Target is not only Judicial Watch's fundraising consultant, it is primarily responsible for "build[ing] a[ ] base of supporters across the country" and within Utah. Deposition of American Target Vice President James Carney at 50.

**1312**

In short, it is safe to say that American Target has "'purposely directed'" its fund-raising efforts "toward residents of [Utah]." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). In so doing, American Target has established minimum contacts with the State of Utah so as to subject itself to the jurisdiction of Utah courts in matters arising out of or relating to their Utah fund-raising activities. Utah may therefore require American Target to submit to the requirements of the Utah Charitable Solicitations Act without violating the Due Process Clause of the Fourteenth Amendment.

### III. CONCLUSION

In accordance with the foregoing, IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.